two victims were placed in danger. Remember, the lady

who comes up and interferes with this matter.

Prosecutor: Yes, your honor; Shabora Kellie

The Court: And she said the ITEM that looked like a gun was

pointed TOWARDS HER, so she was put in danger also.

Defense: On OV-9.

The Court: Yes.

Defense: Your Honor, I respectfully disagree. I understand the

Courts position.

The Court: Okay. Ten Points.

It should be noted that at this point, danger is non-determinative as to

Ms. Kelly. The Judge was 'unable to determine' its 'lethal potential' if

'it was an actual weapon', or not. Also, it was pointed toward Ms. Kelly,

not at Ms. Kelly. Attorney Winters in his closing arguments stated differen

of both the complainant and eyewitness toward the veracity of their

testimony "You have a witness, the complaining witness... the fact that

she apparently makes this identification in a photographic lineup almost

a year after the event. And it is suspicious that here's Rucker's picture

in this circular, the Complainant -- victim says she never saw this

photograph, but it's certainly suspicious that this comes out on November

the 9th, of 2006 and the actual photographic lineup I believe is November

14th," "Now I know, victims and witnesses can't describe everything,

sometimes you're gonna to get certain things wrong. But how can you describ

somebody as Arabic, which is what Shabora, Kelly testified to. And I would

submit that this young lady is not altogether worthy of belief, she's tryin

to help you out, trying to help them out, trying to help the witness out.

She talks about the guy pointing a gun at her. That never happened, she

**never told anything to the police.** She want you to believe she got a good

look at this guy. What did she tell Officer LaRosa? Did you see this guy,

her answer, sort of. We don't base convictions on sort of, possibly, probably, things along that line." "Second witness, Ms. Kelly, I would submit saw the guy running away, yet she's got the same description as a light complected man who looked Arabic and there is this hair bouncing again that she describes, the long hair of the perpetrator. **The physical descriptions just don't match the Defendant. And the scientific, the physical evidence doesn't match the Defendant.** People can be Mistaken all the time about identifications. And as I indicated, it's one of the leading causes of people getting falsely convicted. And in this case, because of a lapse of time, because of the **really contradictory nature of the descriptions** in this case, you can't get away from tall skinny built. You can't, it's on the composite, the guy is six-foot tall, tall skinny built. It just doesn't fit the Defendant." (Tr. Trans. pgs. 89-92).

The Trier of Fact, the Petitioner would submit, was lost of reasoning to the query of "whether or not I can rely on the identification made not only by the complainant," in her conclusive statement of reasons before her verdict. She even discounts the factors DNA possess as evidence. (Tr. Trans. pg.94). She expressed that "we do know it did not match the print so it doesn't **help** verify the description." as to look toward the assumption of guilt instead of the presumption of innocence. She states "but if you look at what the Complainant say and then we remember what Ms Kelly says. Ms. Kelly **identifies the Defendant as being the person she saw.**" (Tr. Trans pg. 95). She is stacking inference upon inference to falsely raise a conclusion of guilt toward what has been proven actually innocent. She states "the fact that Ms. Kelly and the Complainant, Ms. Remias, are convinced beyond a reasonable doubt that it is this Defendant who committed the offense. The question becomes now after I evaluate all of the evidence, am I so convinced?" Then she says something, being a dark complected African-American woman herself, which showed bias against the Petitioner,

"And I believe Ms. Kelly. People don't like hearing this but very frankly
her identification, even saying the Arab look.,**maybe we African-Americans
do that kind of stuff.**But her identification of his complexion, his face
and everything else and she's standing right there when he stands up and
turns toward her, **I believe her."** Again this eyewitness, as to
identification, has nothing but complexion to compare anyone with for
this crime, for which she states of the Petitioners complexion "the skin
tone is off to me?... It's a shade darker that I would say to me, as far
as complexion. It needs to be -- I think it's a little lighter... Lighter
than the sketch." (Tr. Trans. pg. 60). The Trier of Facts' statement brands
itself, the Petitioner submits, as **reverse racial subjectivity,** and stems
from bias. from this subjectivity the Trier of Fact states "And therefore
she verifies or corroborates what the Complainant says, he is guilty of
the two counts of criminal sexual conduct." (Tr. Trans. pg. 97).

## ARGUMENT

I.   **THE TRIER OF FACTS' CONCLUSION OF FACT CAUSED BY THE PREJUDICE OF THE TRIAL COURT, TOWARDS THE GUILT OF THE PETITIONER, EQUATES TO A JUDICIAL PREVARICATION OF PRESUMPTIVE EVIDENCE THAT IN ITSELF WAS CONTRARY TO ITSELF IDENTIFYING A DUE PROCESS MISCARRIAGE OF JUSTICE.**

### Standard of Review

"Existing Precedent binds us to the strictures of 28 U.S.C § 2254 even 'when there is no state court articulating its reasons' Harris v. Stovall 212 F3d 940, 943. If deference to the state court is inapplicable or inappropriate, we 'exercise our independent judgment' and federal claims are reviewed de novo when a state court fails to adjudicate the claim on the merits." McKenzie v Smith 326 F3d 721, 727. "Since habeas corpus is, at its core, an equitable remedy, a court must adjudicate claims when required to do so by the ends of justice. Thus, in a trio of cases, this court firmly established an exception for fundamental Miscarriages of Justice. Murray v. Carrier 106 S.Ct. 2639, 2649, Kuhlmann v. Wilson 1066 S.Ct. 2616, Smith v. Murray 106 S.Ct. 2661. The Petitioner must that the constitutional error 'probably' resulted in the conviction of one who was actually innocent. Schlup v Delo 115 S.Ct. 851, 853. "'Actual innocence' means factual innocence, not mere legal insufficiency. Bousley v. U.S. 118 S.Ct. 1604." Cukaj v Warren 305 F. Supp. 2d 789, 799. "The focus on actual innocence means that a district court... may consider the probative value of relevant evidence that was either wrongly excluded or unavailable at trial." The Petitioner "may obtain review of his constitutional claims only if he falls within the 'narrow class of cases... implicating a fundamental Miscarriage of Justice,' McCleskey v. Zant 111 S.Ct. 1454, 1470."

Petitioner's "claim of innocence is offered only to bring him within this 'narrow class of cases.' A gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits. Herrera v. Collins 113 S.Ct. 853, 862; See also Schlup v. Delo

- 1 -

11 F3d 738, 740. The evidence must establish sufficient doubt about his guilt to justify the conclusion that his" conviction "would be a Miscarriag of Justice unless his conviction was the product of a fair trial." Schlup v Delo 115 S.Ct. at 861.

## Preservation of the issue

This issue was preserved in the Michigan Court of Appeals and Michiga Supreme Court in a timely manner as a challenge to the sufficiency of the evidence consistent with People v. Wright 44 Mich. App. 111. However, even though a clearly erroneous standard was presented the Michigan Court of Appeal never assessed the rightful merits of trial courts Fourteenth Amendment violation.

## Legal Principals

Legal Principals and standards flowing from precedent, not just brigh line rules, can be considered. See Harris v Stovall 212 F3d 940, 942. "We will reverse a judgment for insufficiency of the evidence only if the judgment is not supported by **substantial and competent evidence upon the record as a whole. U.S. v. Beddow 957 F2d 1330."** U.S. v Khalil 279 F3d 358 A statement or representation is false or fraudulent if the maker of it knows it to be untrue; if the person making it does so without regard to whether it is true or false; if it is put forth without a Reasonable basis or if it is made with reckless indifference as to the truth or falsity. U.S. v. Stull 743 F2d 439, at 445-446, cert. denied 105 S.Ct. 1779." U.S. v Hathaway 798 F.2d 902, 909. In Stull, we held that proof of reckless indifference was sufficient in 18 U.S.C. § 1341 prosecutions. Id, 909. "Substantial rights, in turn, are affected only when a defendant shows ' 'prejudice to his ability to defend himself at trial, to the general fairness of the trial, or to the indictment's sufficiency to bar subsequen prosecutions.' U.S. v. Miller 105 S.Ct. 1811, 1816 n 5." Hathaway at 911.

- 2 -

"A state prisoner can win a federal habeas corpus only upon a showing that the State participated in the denial of a fundamental right protected by the Fourteenth Amendment. This Courts decisions establish that a state criminal trial, a proceeding initiated and conducted by the State itself, is an action within the meaning of the Fourteenth Amendment." Cuyler v Sullivan 100 S.Ct. 1708, 1715. "Under the In re Winship 90 S.Ct. 1068, decision , it is clear that a state prisoner who alleges that the evidence in support of his state conviction cannot be fairly characterized as sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt has stated a federal constitutional claim... It follows that such a claim is cognizable in a federal habeas corpus proceeding." "Congress in § 2254 has selected the federal district courts as precisely the  forums that are responsible for determining whether state convictions have been secured in accord with federal constitutional law. The federal habeas corpus statue presumes the norm of a fair trial in the state court and adequate state postconviction remedies to redress possible error See 28 U.S.C. § 2254(b), (d)." Jackson v Virginia 99 S.Ct. 2781, 2790-2791 "If a petitioner such as Schlup presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the is also satisfied that the trial was free of nonharmless constitutional error, the petitioner should be allowed to pass through the gateway and argue the merits of his claims." Schlup v Delo 115 S.Ct. 851, 861. "Such a Miscarriage would exist only if the record is devoid of evidence on a pointing to guilt , or... because the evidence on a key element was so n tenuous that a conviction would be shocking. U.S. v. Pierre, 958 F2d 1304, 1310, cert. denied, 113 S.Ct. 280." U.S. v McCarty 36 F3d 1349, 1358. Legal Principals formed by Fed. Rules of Evid. 801, 701, 613(b), 608(b) 605, 405(b), 403, 303(a), and 201(b) seem to dictate focus.

Summary of Argument

John Quincy Adams once stated "facts are indeed stubborn things, and whatever our wishes, our inclinations, or the dictates of our passion they cannot alter the state of facts and evidence." Therefore, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See <u>Johnson</u> v. <u>Louisiana</u> 92 S.Ct. at 1624-1625. This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." Jackson v Virginia 99 S.Ct. 2781, 2789. Blacks law dictionary eighth edition describes a Miscarriage of Justice as "A grossly unfair outcome in a judicial proceeding, as when a defendant is convicted despite a lack of evidence on an essential element of the crime." Since this case has no physical evidence pointing to the petitioners guilt, we must assess trial court error through the identification testimonies of the complainant and eyewitness since the bulk issue of this case is by hornbook identification. Let's start with the complainant. In <u>U.S. ex. rel. Harden</u> v. <u>Follette</u> 333 F. Supp. 371 we find an issue that "before the imprint arising from the unlawful identification procedure, there was already such a definite image in the witness' mind that he is able to rely on it at trial without much, if any assistance from its successor. <u>U.S. ex. rel. Phipps</u> v. <u>Follette</u> 428 F2d 912, 915. By such test," the victim of a rape, "<u>Mrs. Martinolich in-court identification must fail.</u> Even though Mrs. Martinolich had ample opportunity to observe the assailant, she admitted at the Lott pre-trial hearing, at the grand jury hearing and at the petitioner's trial that she didn't have a good image of the assailant. Obviously, the precinct identification provided much assistance to her

in-court identification," Infra 379, seeing that "the physical features
of the petitioner differ from the victims description after the incident
in that petitioner weighed 165 lbs. whereas the victims statement said
that the assailant weighed 190 lbs." Id 376. "We turn, then to the central
question, whether under the 'totality of the circumstances' the
identification was reliable even though the confrontation procedure was
suggestive. Neil v Biggers 93 S.Ct. 375, 382. "Thus, whether the witnesses
in this case observe the crime or were too distracted; whether the witnesse
gave a detailed, accurate description; and whether the witnesses were under
pressure from prison officials or others are all questions of fact as to
which the statutory presumption of correctness applies. In Neil v. Biggers,
supra, 93 S.Ct. at 382, we noted that 'the factors to be considered in
evaluating the likelihood of misidentification include the opportunity of
the witness to view the criminal at the time of the crime, the witness'
degree of attention, the accuracy of the witness' prior description of the
criminal, the level of certainty demonstrated by the witness at the
confrontation, and the length of time between the crime and the
confrontation.' Each of these 'factors' requires a finding of historical
fact as to whether § 2254(d) applies. The ultimate conclusion as to whethe
the facts as found **state a constitutional violation is a mixed question
of law and fact as to which the statutory presumption does not apply.**
Section 2254(d) permits a federal court to conclude, for example, that a
state finding was 'not fairly supported by the record.'" Sumner v Mata 103
S.Ct. 1303, 1307. This is a showing that it is impermissible for "a court
to make its own subjective determination of guilt or innocence." Jackson
supra, 2789 n 13. The presumption of correctness applies to both the
Petitioner and the respondent. Burden v Zant 498 U.S. 433, 436-437.
(peremptory reversing for failure to apply presumption of correctness to
facts favorable to petitioner). Using these tests in the instant case, jus

as with Mrs. Martinolich, the Complainant's in-court identification must fail. As in U.S. ex. rel. Phipps, 'there was already such a definite image in the witness' mind,' that was given to the police at the crime scene different from that of the petitioner's description, even from that of the sketch. 'Obviously, the precinct identification provided much assistance to her in-court identification,' along with that here, where the Complainant works, is the Petitioners picture in this circular, produced 6 days before the photo lineup, whereas the incident occurred 1 year, 1 month, and 12 days, or 13 2/5 months, or 407 days before the lineup. It's the same picture that's in the lineup. As well as the police calling the Complainant to tell her of an incident where a females butt was grabbed and they think it's same assailant in the instant case. The Petitioner would suggest that any in-court identification by such a witness would be tainted. In this case, it would seem as if the Trier of Fact excluded the probative value of the witnesses prior inconsistent statements. If it were so, the view in People v. Adamski 198 Mich. App. 133 might instill proper assessment "The excluded prior inconsistent statement's probative value with regard to the Complainant's credibility went beyond a tendency to show bias or ulterior motive - it called in to question the veracity of the bulk of the Complainant's inculpatory testimony. We therefore conclude that the error was not harmless and reverse defendant's conviction." Id, 139. White v. Illinois 112 S.Ct. 736 stated "We therefore think it clear that the out-of-court statements admitted in this case had substantial probative value, value that could not be duplicated simply by the declarant later testifying in court. To exclude such probative statements under the strictures of the Confrontation Clause would be the height of wrongheadedness, given that the Confrontation Clause has as a basic purpose the promotion of the 'Integrity of the fact-finding process.' Coy v. Iowa 108 S.Ct. 2789, 2802, (quoting Kentucky v. Stincer 107 S.CT. 2658, 2662)." People v. Malone 445

Mich. 369, identifies the U.S. Supreme Courts view of an out-of-court statement, "It is, of course, true that the out-of-court statement may have been made under circumstances subject to none of these protections. But if the declarant is present and testifying at trial, the out-of-court statement for all practical purposes regains most of the lost protections If the witness admits the prior statement is his, or if there is other evidence show the statement is his, the danger of faulty reproduction is negligible and the jury can be confident that it has before it two conflicting statements by the same witness. Thus, as far as the oath is concerned, the witness must now affirm, deny, or qualify the truth of the prior statement under the penalty of perjury... California v. Green 399 U.S. 149, 158-159." Id, 382. It is therefore 'not offered for the truth of the matter asserted, See Fed. R. Evid. 801(c); rather, it is offered only to establish that the witness has said both "x" and "not x" and is therefore unreliable.' U.S v Gramham 858 F2d 986, 990 n 5. The U.S. Supreme Court also note that "One of the most effective ways to lie is to mix falsehood with truth, especially truth that seems particularly persuasive." Williamson v U.S. 114 S.Ct. 2431. In People v. Lemmon 456 Mich. 625, "the Judge reaffirmed her opinion that the verdict had resulted in a 'Miscarriage of Justice' stating that the 'credibility of the orally-testifying witnesses and their demeanor leaves this court with a firm belief that the defendant should be tried by a different jury." The Judge "found the demeanor of the witnesses questionable in that the older daughter 'giggled at times, but not at embarrassing moments when one might expect a child to giggle,' that 'both children appeared to look at the prosecutor and others for approval rather than candidly testifying as to their memory.' The Judge indicated that 'the only evidence of the defendant's guilt was the testimony of the girls. There were no medical records, counseling records, or corroborating testimony." Id, 632. Factors that are similar to the case at bar.

- 7 -

The Complainant, at trial, admitted that the out-of-court statement of identification was hers, while at the same time giving in-court testimony that the Petitioner, whom we have establish has a different description, is the assailant, affirming also that the prior statement of identification is accurate, and therefore, from the Complainant, we have a testimony of two different identifications of one assailant by the Complainant as the person to attack her. The demeanor of the Complainant became questionable not by the defense counsel, but by the prosecutor, stating "And I notice that you're smiling and you kind of just, you know, chuckled a little bit. It's not because you think this is a light hearted situation? (Tr. Trans. pg. 24). Though her answer was no, the Complainants demeanor and inconsistency of testimony prompts the question of partiality on behalf of the Complainant. However the case maybe I'm no expert, it would be better to receive an expert opinion on the matter. In U.S. v. Stevens 935 F2d 1380, "Dr. Penrod explained that, once a witness makes an identification, he or she will tend to stick with that initial choice at subsequent photographic arrays or lineups, even if it was erroneous. The reason for this phenomenon, Dr. Penrod submits, is that "information acquired at an initial identification often influences identifications made later on.' That is, witnesses sometimes base subsequent identifications on their vague recollection of a face viewed in a prior array or lineup, not on their memory of the crime itself... If the victims erroneously identified Stevens from the wanted board, the scientific studies cited by Dr. Penrod suggest that the victims would tend to remain faithful to that choice at later identifications, because they recognized Stevens's face from the wanted board. There is, in short, a nexus between Dr. Penrod's tendered testimony and the facts in this case... According to Dr. Penrod, these studies have revealed 'a fairly weak relationship' between confidence and accuracy... The factors listed are characteristic of all studies in the field of

- 8 -

eyewitness identifications. Scientist cannot replicate real-life violent
crimes; therefore, they are forced to conduct their testing in a simulated,
yet somewhat artificial, environment. This limitation, we suspect, applies
to studies concerning cross-racial identification, weapon focus, and stress;
yet the district court readily admitted Dr. Penrod's testimony on these
subjects. Dr. Penrod's explication of the confidence/accuracy studies could
prove helpful to the jury in assessing the reliability of Smith's and
McCormack's identifications. That witnesses oftimes profess considerable
confidence in erroneous identifications is fairly counterintuitive. Downing
753 F2d at 1230 n 6 ("To the extent that a mistaken witness may retain
great confidence in an inaccurate identification, cross-examination can
hardly be seen as an effective way to reveal the weakness in a witness'
recollection of event.')." There is a possibility that the circular just
possibly influenced the Complainants identification at the precinct lineup.

The Petitioner submits that this possibility actually occurred and that
the suggestiveness of undue Police pressure in <u>Davis</u> v. <u>Alaska</u> 94 S.Ct.
1105, 1108; persistent in this case, was the cause.

       In assessing the testimony of the eyewitness, a negative and internally
inconsistent testimony become obvious. Let's examine the Cross-Examination:

              Q   Okay. Let me see if I can refresh your memory.

                     Mr. Winters: If I can approach the witness?

                     Court: All right.

(By Mr. Winters, Continuing):

              Q   Question here, "Did you see this guy?" and it's got two words
                  after that. The two words are sort of.

              A   Sort of.

              Q   Okay. That's what you told Officer LaRosa, right?

              A   Yes.

              Q   You sort of saw the guy?

       A   Sort of.

A    Sort of.

Q    Said he was light complected, right?

A    Lighter than me. When I say, you know, say that, by me being

a dark skinned woman, so I would say --

Q    So the guy was lighter than you right.

Q    Yes. (Tr. Trans. pgs. 55-56).

Here we have testimony from the eyewitness that she couldn't be able to

give accurate description of the assailant, for her testimony to be able

to corroborate the Complainants testimony towards identification, showing

that she was only able to describe the assailants complexion. For which

now we arrive at a problem;

(By Mr. Winters, Continuing):

Q    And that's what the guy looked like, right?

A    Yes, but that's --

Q    Holding up Exhibit Number --

The Court: A copy of Exhibit Number --

Mr. Winters: A copy of Exhibit Number 2.

Ms. Slameka: Judge, if I may tender Exhibit

Number One to Counsel.

Witness: The skin tone is off to me.

(By Mr. Winters, Continuing:

Q    The color photograph the skin tone is off; how do you mean

off?

A    It's a shade darker that I would say to me, as far as

complexion. It needs to be -- I think it's a little lighter.

The Court: You think that the real person is

lighter than that?

Witness: Um-humm. Lighter than the sketch.

The Court: And so you're saying that you think that

- 10 -

the exhibit that he's holding up should be a little lighter?

Witness: Yes.

Mr. Winters: I see.

The Court: Okay. (Tr. Trans. pgs. 59-60).

Remember, the Trial Court credited the vernacular of the eyewitness, as to complexion, with the eyewitness now showing that, in regards to complexion as to a description, the Petitioner's is completely different. This same witness also offered testimony of two different body types of the assailant. This caused the eyewitness testimony, as to the description of the assailant, to be internally inconsistent. Additionally, the Trier of Fact allowed this witness to give opinion testimony, in which MRE and Fed. Rules of Evid. 701 states "If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are    (a) Rationally based on the perception of the witness And     (b) helpful to a Clear understanding of the witness' testimon or the determination of fact in issue." The eyewitness failed this test by not being able to give an accurate description of the assailant at the time of the incident, but yet, providing a positive description in-court of the Petitioner for after which she was asked "What is it about Mr. Rucker that you remember?" She states "HIS EARS." The sole descriptive character for which there is nothing distinctive, for the eyewitnesses irrationally based in-court identification of the petitioner that gave way to prejudice. "While Fed.R.Evid. 402 provides that 'all relevant evidence is admissible,' Rule 403 provides that 'relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice...'" State v Elmer 815 F.Supp. 319, 321. In U.S. v. Alzate 47 F3d 1103, the government conceded "that the materiality standard applicable to this case... is that which applies when false testimony has been knowingly used." Id 1109. "It is established that a conviction obtained through use of false

- 11 -

evidence, known to be such by representatives of the State, must fall under
the Fourteenth Amendment.... The same result obtains when the State, although
not soliciting false evidence, allows it to go uncorrected when it appears.'
Napue v. Illinois 79 S.Ct 1173, 1177. The prosecutor presenting the
government's case need not be aware that testimony is false in order for
a due process violation to occur, it is sufficient if another government
attorney knows about the false testimony and no steps are taken to correct
it. Giglio v. U.S. 92 S.Ct. 763.... there may be a deprivation of due process
if the prosecutor reinforces the deception by capitalizing on it in closing
argument, U.S. v. Valentine 820 F2d 565;... False evidence includes untrue
testimony going to the credibility of a witness. Napue, 79 S.Ct. at 1177.
Mills v Scully 826 F2d 1192, 1195. Obviously, "The effective impeachment
of one eyewitness can call for a new trial even though the attack does not
extend directly to others, as we have said before. See U.S. v. Agurs 96
S.Ct. 2392, 2401-2402, n 21" Kyle v Whitley 115 S.Ct. 1555, 1571. " In a
series of subsequent cases, the Court has consistently held that a conviction
obtained by knowing use of perjured testimony is fundamentally unfair, and
must be set aside if there is any reasonable likelihood that the false
testimony could have affected the judgment of the jury. it is this line
of cases on which the Court of Appeals placed primary reliance. In those
cases the Court has applied a strict standard of materiality, not just becaus
they involve prosecutorial misconduct, but more importantly because they
involve a corruption of the truth-seeking function of the trial process.
"If a state has contrived a conviction through the pretense of a trial
which in truth is but used as a means of depriving a defendant of liberty
through **a deliberate deception of court and jury by the presentation of
testimony known to be perjured.** Such a contrivance by a state to procure
the conviction and imprisonment of a defendant is as **inconsistent with the**

**rudimentary demands of Justice** as is the obtaining of a like result by

- 12 -

intimidation.' Mooney v. Holohan 55 S.Ct. 340, 342." Agurs, at 2397. "Our holding does not foreclose the possibility that in an unusual case, a deliberate an especially egregious error of the trial type, or one that is combined with a pattern of prosecutorial misconduct, might so infect the integrity of the proceeding as to warrant the grant of habeas relief, even if it did not substantially influence the jury's verdict. Cf. Greer v. $ Miller 107 S.Ct. 3102, 3110." Brecht v Abrahamson 113 S.Ct. 1710, 1722. "We note the presumption that a trial judge in a bench trial knows applicable law." People v Shermann-Huffman 466 Mich. 39, 43.

The cause, so obvious to see here are:  The suggestiveness of the photographic lineup; The Complainant's prior inconsistent statement of identification; The eyewitness' negative and false testimony; Prosecutoria misconduct for the use of false testimony; and as expressed in the Statement of Facts, Judicial partiality in favor of the eyewitness See Liteky v U.S. 114 S.Ct. 1147, 1157. These are the multiple causes of the 'pervasive bias' of the Trier of Fact. Bias that "even though it springs from the facts adduced or the events occurring at trial, it is so extreme as to display clear inability to render fair judgement." Liteky v U.S. 114 S.Ct. 1147 at 1155. The question now is whether the Trier of Fact "committed plain error or 'whether there was a Manifest Miscarriage of Justice.' Such a Miscarriage would exist only if the record is devoid of evidence pointing to guilt or 'because on a key element of the offense was so tenuous that a conviction would be shocking' U.S. v. Ruis 860 F2d 615, 617." U.S. v Pierre 458 F2d 1304, 1310. The answer is in answering what exactly the Trier of Fact did. In Michigan Law, "An abuse of discretion exists when the court's decision is so grossly violative of fact and logic that it evidences perversity of will, defiance of judgment, and exercise of passion or bias. People v. Bahoda 448 Mich. 261, 289, n 57. Stated somewhat differently. an abuse of discretion also exist when an unprejudiced person, considering

- 13 -

the facts on which the trial court acted, would say there was no justification or excuse for the ruling. <u>People</u> v. <u>Taylor</u> 195 Mich. App. 57, 60." People v Ullah 216 Mich. App. 669, 673. It is also well established in Michigan that "a Judge in a bench trial must arrive at his or her decision based upon the evidence in the case." People v Simon 189 Mich. 565, 568. The Simon court stated "We hold also that the trial judge failed to make adequate findings of fact. MCR 2.517(A)(1); MCR 6.403. The purpose is to aid appellate review by revealing the facts relied upon by the factfinder on each element of the law applied. <u>People</u> v. <u>Armstrong</u> 175 Mich App. 181, 184. The sufficiency of the findings must be reviewed in the context of the evidence and the specific legal and factual issues raised by parties. <u>People</u> v. <u>Rushlow</u> 179 Mich. App. 172, 177. The Court may call Id, 568-569. "The Court may call attention to particular facts in a manner which is not prejudicial." People v Ciatti 17 Mich. App. 4. "A Court's ultimate finding regarding a particular factor is not unlimited; rather, it must be supported by the weight of the evidence." Baker v Baker 411 Mich 561, 584-585, "In accordance **with the rules** and in like manner as if such cause were being tried before a jury." MCLA 763.4. The legal and material issue in this case is 'hornbook identification' (Tr. Trans. pg. 6). The Trier of Fact based its decision on the eyewitnesses negative and internally inconsistent false testimony stating "I believe Ms. Kelly.... And therefore she verifies or corroborates what the complainant says,." (Tr. Trans. pg. 97). As we identified, the Complaints testimony was proven false by the incorporation of prior inconsistent statements of identification into her in-court examination without any justification for its inconsistency, which is also dismantled by the suggestive identification proceedings for which there was no counsel for the defense. The Trier of Fact also showed partiality in favor of the eyewitness, and reverse racial subjectivity by roper comments of ethnicity stating in one "maybe we African-Americans do that

do that kind of stuff." (Tr. Trans. pg. 97). The test, as <u>People</u> v. <u>Sterling</u>
154 Mich. App. 223, proscribes, is weather "a judges questions and comments
'may well have unjustifiably aroused suspicion in the mind of the jury'
as to a witness' credibility,... and weather partiality 'quite possibly
could have influenced the jury to the detriment of the defendants case.'"

   <u>People</u> v. <u>Redfern</u> 71 Mich. App. 452, 457" Id 228. The Sterling court
held "Although the precise translation of the trial court's comment escapes
us, we can only conclude from the context that it was a derogatory comment
on the credibility of the witness. Viewed together we conclude that from
these questions and comments invade the province of the jury and 'pierced
the veil of judicial impartiality" <u>People</u> v. <u>Audison</u> 126 Mich. App. 829,
833. "We have no recourse but to find that defendant was denied a fair trial.
The fact that defense counsel made no objection to some of these comments
and questions does not alter the result since defense counsel may have been
understandably reluctant to challenge the judge's own behavior on the
bench." "Plain error embodies the notion that an obvious mistake seriousn
affecting the fairness or integrity of a judicial proceeding has been
committed. Courts exercise their power to notice plain error only in
exceptional circumstances. <u>U.S.</u> v. <u>Atkinson</u> 56 S.Ct. 391. We have described
plain error as error 'of such sufficient gravity as to substantially affect
the rights of the defendant and prejudice him in the eyes of the jury to
to the extent that our failure to note it would perpetuate a Miscarriage
of Justice.' <u>Chubet</u> v. <u>U.S.</u> 414 F2d 1018, 1021." U.S. v Massey 594 F2d 676,
682. "In <u>Fry</u> v. <u>Pliler</u> 127 S.Ct. 2321, the supreme court held that a federal
habeas court 'must assess the prejudicial impact of constitutional error
in a state-court criminal trial under the ''substantial and injurious effect
standard set forth in Brecht, 113 S.Ct. 1710, weather or not the state
appellate court recognize the error and reviewed it for harmlessness under
the 'harmless beyond a reasonable doubt' standard set forth in <u>Chapman</u> v.

California 87 S.Ct. 824....' 127 S.Ct. at 2328." Vasquez v Jones 496 F3d
564, 575. In Stevens the Court stated "The Government contends that we
should affirm Stevens conviction because the district court's errors were
harmless under Fed.R.Crim.P. 52(a). If the evidence against Stevens were
overwhelming, we could adapt such an approach, but that is not the case
here.... both of the district court's errors involved evidence that
detracted from the reliability of the victims' identification-the sole
predicate for Steven's convictions. Had the jurors learned that confidence
is a poor indicator of the accuracy of an identification,... the outcome
of their deliberations could have been different. Simply put, we are not
left with 'a sure conviction that the error did not prejudice the
defendant,'U.S. v. Jannotti 729 F2d 213, 220 n 2, nor can we say that it
is 'highly probable' that the district court's errors did not contribute
to jury's judgment of conviction, Government of Virgin Islands v. Toto
529 F2d 278, 284. We therefore decline to affirm on harmless error grounds.
Stevens, at 1406. "Although 'assessment of the credibility of witnesses
is generally beyond the scope of federal habeas review of sufficiency of
evidence claims' Matthews v. Abramajty 319 F3d 780, 788, a federal habeas
court need not to defer to the state court factfinder's credibility
determinations when reviewing an error for harmlessness. See, e.g., Fulcher
444 F3d at 809." Vasquez at 578 n 12. "A plain error standard is unnecessary
to correct Miscarriages of Justice. The terms 'cause' and 'actual prejudice'
ar not rigid concepts; they take their meaning from principles of comity
and finality discussed above. In appropriate cases those principles must
yield to the imperative of correcting a fundamentally unjust incarceration."
Engle v Issac 102 S.Ct. 1558, 1575-1576. It is obvious, in the case at bar,
that by the automatic cross-cancellations of the complainants and eyewitness
testimonies, 'because on the key element of the offense was so tenuous that
a conviction was shocking' 'the record is devoid of evidence pointing to

- 16 -

guilt.' As a matter of fact, there was evidence of the Petitioners innocence presented through the prosecutions presentation of the case. We know the assailant opened the door without the use of any gloves having no time to clean off his finger prints. Logic tells us that any finger prints found would belong to the assailant. The Prosecutor stated "three finger print lifts taken from the drivers side rear-door window glass and one finger print lift from the driver's door frame above the window." (Tr. Trans. pg. 93). This evidence would show that, however much the door was closed it was opened enough for the assailant to open the door with one finger using three fingers of his other hand as leverage to force the door open. However, "Latent print search revealed negative results with respect to Mr. Rucker." (Tr. Trans. pg. 77). This evidence would show that the Petitioner is innocent. See Agurs, 96 S.Ct. at 2401 n 18. "The Supreme Court in Arizona v. Youngblood 109 S.Ct. 333 held that 'unless a criminal defendant can show bad faith on the part of police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.' Id at 337." Stevens at 1387."On January 28, 2009, the Senate Appropriations Committee conducted hearings involving the impact of closing the Detroit Crime Lab. The Lab was closed in 2008, because of problems with evidence handling.... There may be as many as 20,000 cases going back several years that have to be reviewed.... In March, Wayne County Prosecutor Kym Worthy reported that her office had 'identified 147 cases of imprisoned people that will require the retesting of evidence' as a result of problems in the Detroit lab. This was considered the first of potentially thousands of cases that may have been mishandled by the lab.... On April 20, Worthy reported that her office were looking at lab cases on a 'piecemeal basis.' She reported that five or six full time attorney are needed to review the cases. 'We're aware of the city's fiscal needs, but we consider people's liberty to be more important than economic development, or anything else the city may

- 17 -

have on it's plate.'" MI-CURE NEWS, August 2009, Problems Continue From

Closing of Detroit Police Crime Lab. The Trier of Fact, in the case at bar,

noted the incompetence of investigating officers (Detroit Police Evidence

Technicians), noting that the assailant was never at the back of the

complainants truck. (Tr. Trans. pgs. 38, 94-95). In Addition, they only

photographed the crime scene, which was inside the vehicle. On top of

everything else, the victim stated her bra was on, her shirt was on and

the assailant was 'kissing and slobbering' all over her. She told this to

the Police, yet they did not take any of the complainants clothing to check

for what is obvious to check for, DNA of the assailants saliva on the

clothing. (Tr. Trans. pgs. 13-15). Exculpatory evidence of the Petitioners

innocence. CJI2d 3.2(1) Reads "A person accused of a crime is presumed to

be innocent. This means that you must start with the presumption that the

defendant is innocent. This presumption continues throughout the trial and

entitles the defendant to a verdict of not guilty unless you are satisfied

beyond a reasonable doubt that he/she is guilty." Along with the fact that

the convicting evidence was so unreasonable it was tenuous, the prosecutor

brought to the Trier of Facts attention Alibi witnesses for the defense

whom were there at Trial to testify the whereabouts of the Petitioner on

the day and time of this horrible event. Defense counsel was not prepare

and thought it best not to use these witness. I bring this to your attention

because, in the event that the Court saw that the Petitioner was guilty,

under the Presumption of Innocence, the Court has a responsibility,

sua sponta, to bring those Alibi witnesses forth. These witness, if they

would have taken the stand, proven the Petitioners innocence. "Public

officials, whether governors, mayors or police, legislators or judges, who

fail to make decisions when they are needed or who do not act to implement

decisions when they are made do not fully and faithfully perform the duties

of their offices." Scheuer v Rhodes 94 S.Ct. 1683, 1689.

- 18 -

II.     THE MICHIGAN COURT OF APPEALS, FAILING TO ADDRESS THE CLEARLY ERRONEOUS REVIEW OF THE FINDINGS OF FACT, IDENTIFIED THE CORRECT GOVERNING LEGAL PRINCIPAL ON LINE-UPS AND EYEWITNESSES, FROM [THE SUPREME] COURT'S DECISIONS, BUT UNREASONABLY APPLIED THAT PRINCIPAL TO THE FACTS OF THE PETITIONERS CASE, MAKING FINDINGS THAT NEITHER FAIRLY SUPPORT THE RECORD NOR [LAW], RESULTING IN CONSTITUTIONAL ERROR.

## Standard of Review

The Petitioners claim would be decided by "whether state court decision involved unreasonable application of clearly established Federal law, as determined by Supreme Court; the 'unreasonable application' clause in § 2254(d)(2) addresses mixed questions of law and fact; a decision represents an 'unreasonable application of' precedent... when that decision fails to apply the principle of a precedent in a 'context where such failure is unreasonable, or when that decision recognizes the correct principle from higher court's precedent, but unreasonably applies that principle to the fact before it; when that decision applies a precedent in a context different from the one in which the precedent was decided and in which extension of the legal principle of the precedent is not reasonable." Never v. Killinger 169 F3d 352, 358.

When there is a factual dispute which, if resolved in the Petitioner' favor would warrant relief, and the State court has not afforded the Petitioner a full and fair evidentiary hearing, a Federal Habeas Petitioner typically is entitled to discovery and evidentiary hearings." Harris v Johnson 81 F3d 535, 540. Simply put "Where a claim is fairly presented in State court, but the State court, although denying the claim, fails to address it, a federal court on habeas review must conduct an independent review of the State court's decision." Harris v Stovall 212 F3d 940, 943.

"The authority created by Rule 52(b) is circumscribed. There must be an 'error' that is 'plain' and that 'affects substantial rights.'... the error 'seriously affects the fairness, integrity or public reputation of the judicial proceedings.' U.S. v. Young 105 S.Ct. 1038, 1046.... We

previously have explained that the discretion conferred by Rule 52(b) should be employed 'in those circumstances in which a Miscarriage of Justice would otherwise result.' Young, 105 S.Ct. at 1046. In our collateral-review jurisprudence, the term 'Miscarriage of Justice' means that the defendant is actually innocence. See e.g., <u>Sawyer</u> v. <u>Whitley</u> 112 S.Ct. 2514, 2519 The court of appeals should no doubt correct a plain forfeited error that causes the conviction or sentencing of an actually innocent defendant. see e.g., Wibborg v. U.S. 16 S.Ct. 1127. Review therefore is inclusive to 'whether there was a Manifest Miscarriage of Justice.' Such a Miscarriage would exist only if the record is devoid of evidence pointing to guilt or 'because on the key element of the offense was so tenuous that a conviction would be shocking.' <u>U.S.</u> v. <u>Ruis</u> 860 F2d 615, 617." U.S. v Pierre 458 F2d 1304, 1310, formulated by the state court.

## Preservation of the issue

This issue was presented to the Michigan Supreme Court in a timely manner through <u>Neil</u> v. <u>Biggers</u> 93 S.Ct. 375; and <u>U.S.</u> v. <u>Gypsium Co.</u> 68 S.Ct. 525, and MRE and Fed.R.Evid. 201(b).

## Legal Principles

People v. Ramsey 89 Mich. App. 468, Shows that "under the clearly erroneous standard for review of findings of fact, the evidence in a non-jury case is subjected to a more rigorous review than that in a jury case since a jury is more likely to be right than the judge alone." "On review of a Judge's findings and conclusion, we are obliged, under the 'clearly erroneous' standard, to reverse if we are left with the definite and firm conviction that a mistake was made.... Under GCR 1963, 517.1, an appellate court will set aside the findings of fact of a trial court sitting without jury when such findings are clearly erroneous. In construing comparable 'clearly erroneous' language in Rule 52(a) of the Federal Rules of Civil Procedure, The United States Supreme Court has stated that 'a finding is

- 20 -

'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' Tuttle v. Department of State Highways 397 Mich. 44, 46." "Findings of fact control inconsistent conclusion of law.' Kane v. Klos 50 Wash. 2d 778, 789; "A judgment cannot stand when it is based upon findings of fact of record which are antagonistic, inconsistent, or contradictory, or upon conclusions of law which are at variance with the findings of fact.' Wenzel v. Wenzel 283 SW2d 882, 887." People v Garcia 389 Mich. 250, 270-272, 279. "Where the record presents alternative interpretations, the task should not be imposed on the appellate court of picking and choosing those findings which seem to it preferable. As noted by Judge Brown in Mlandinich v. U.S. 371 F2d 940, 942." U.S. v. Hollis 424 F2d 188, 192. "We find serious problems concerning the accuracy of eyewitness identification and that real prospects for error inhere in the very process of identification completely independent of subjective accuracy, completeness or good faith of witness'." People v Anderson 389 Mich. 155, 180. "The annals of criminal law are rife with instances of mistaken identification... the identification of strangers is proverbially untrustworthy... The influence of improper suggestion upon identifying witnesses probably accounts for more Miscarriages of Justice than any other single factor... Suggestion can be created intentionally or unintentionally in many subtle ways. And the dangers for the suspect are particularly grave when the witness' opportunity for observance was insubstantial, and thus his susceptibility to suggestion the greatest." U.S. v Wade 87 S.Ct 1926, 1933.

**Summary of Argument**

Mr. Justice Harlan once wrote: "The sound reason why [the right to counsel] is so freely extended for a criminal trial is the severe injustice risked by confronting an untrained defendant with a range of technical

- 21 -

points of law. evidence, and tactics familiar to the prosecutor but not
to himself." Miranda v Arizona 86 S.Ct. 1602, 1649. The United States
Supreme Court fashioned new exclusionary rules "to deter law enforcement
authorities from exhibiting an accused to witnesses before trial for
identification purposes without notice to and in the absence of counsel."
Stovall v Denno 87 S.Ct. 1967, 1970. "That a post-indictment pre-trial
lineup at which the accused is exhibited identifying witnesses is a critical
stage of the criminal prosecution; that police conduct of the such a lineup
without to and in the absence of his counsel denies the accused his Sixth
[and Fourteenth] Amendment right to counsel." Gilbert v California 87 S.Ct.
1951, 1956. In the instant case, there is material evidence involving the
violation Petitioners right to counsel directly caused by law enforcement
authorities view of the Petitioner as being 'the focus of the investigation'
before the post-indictment pretrial photolineup. U.S. v. Ash 93 S.Ct. 2568
however, is the pivotal case that held "There's no right to counsel where
there's a photographic lineup." The U.S. Supreme Court, however, hasn't
with the holding of People v. Johnson(On Rem) 180 Mich. App. 423, that
the accused is attached the right to counsel when he becomes "the focus
of the investigation" causing the photographic lineup."Since counsel's
presence at the lineup would equip him to attack not only the impact of
lineup identification but the courtroom identification as well, limiting
the impact of violation of right to counsel to exclusion of evidence only
of identification at the lineup itself disregards a critical element of
that right. We think it follows that the proper test to be applied in these
situations is that quoted in Wong Sun v. U.S. 83 S.Ct. 407, 417, "'Whether
granting establishment of the primary illegality, the evidence to which
instant objection is made has been come at by exploitation of that illegalit
or instead by means sufficiently distinguishable to be purged of the primary
taint.' Maguire, Evidence of Guilt, 221 (1959)." See also Hoffa v. U.S.
87 S.Ct. 408. Application of this test in the present context requires

consideration of various factors; for example, prior opportunity to observe
the alleged criminal act, the existence of any discrepancy between any pre-
lineup description and the defendant's actual description, any
identification prior to lineup of another person, the identification by
**Picture** of the defendant prior to lineup, failure to identify the defendant
on a prior occasion, and the lapse of time between the alleged act and the
lineup identification. **It is also relevant to consider those facts which,
despite the absence of counsel, are disclosed concerning the conduct of
the lineup." Wade at 1939-1940. The Johnson Court noted that "at a pre-**
trial Wade hearing on the suppression of the identification, the
investigating officer indicated that, before the police could follow up
on this information, they received a call from someone at the trailer park.
on the basis of an article in a local paper, that person informed the police
that a possible suspect resided at the park at the address given on the
title registration. At the time of the lineup, the police had already made
contact with the defendant and knew the his whereabouts. Since the record
clearly shows that defendant **had become the focus of the police
investigation** when the lineup was conducted, counsel for defendant should
have been present at the photographic lineup and therefore evidence of the
identification should have been suppressed. People v. Harrison 138 Mich.
App. 74, 76-78, People v. Cotton 38 Mich. App. 763, 769-770." "In Kachar,
supra, pp. 88-89, Supreme Court indicated that the presence of counsel is
required at a photographic identification where the defendant, although
not in custody, is the focus of the investigation. Kachar, supra, p. 89
noted the Andersons approval of a decision of this Court, Cotton, supra,
769-770, in which we held that counsel must be presented at a photographic
identification when 'its purpose is to build a case against the defendant
**by eliciting identification evidence, not to extinguish a case against an
innocent bystander.'** Even though Kachar is not binding precedent because

the controlling opinion was signed by only two justices, its 'focus'
consideration has been used by this Court."Id, 425-427. Both Johnson's and
Wade's theories shine a light on the case at bar. If a Wade hearing would
have occurred, the Michigan Court of Appeals would have to make notice of
the probative value of the circular, the fact that there was no counsel
for the defense where defendant, since the police called the complaint and
told her a guy was arrested and they think that that individual was the
assailant, was the 'focus of the investigation.' Wade specifies that "case
with secret interrogations, there is serious difficulty in depicting what
transpires at lineups and other forms of identification confrontations.
'Privacy results in secrecy and this in turn results in a gap in our
knowledge as to what in fact goes on * * *." Miranda, supra, at 1614. For
the same reasons, the defense can seldom reconstruct the manner and mode
of lineup identification for judge or jury at trial. Those participating
in a lineup with the accused may often be police officers; in any event,
the participants' names are rarely recorded or divulged at trial. The
impediments to an objective observation are increased when the victim is
the witness. Lineups are prevalent in rape and robbery prosecutions and
present a particular hazard that a victim's understandable outrage may
excite vengeful or spiteful motives. In any event, neither witnesses nor
lineup participants are apt to be alert for conditions prejudicial to the
suspect. And if they were, it would likely be of scant benefit to the
suspect since neither witnesses nor lineup participants are likely to be
schooled in the detection of suggestive influences. Improper influences
may go undetected by a suspect, guilty or not, who experiences the emotional
tension which we might expect in one being confronted with potential
accusers. Even when he does observe abuse, if he has a criminal record he
may be reluctant to take the stand and open up the admission of prior
convictions. Moreover any protestations by the suspect of the fairness of

the lineup made at trial are likely to be in vain; the jury's choice is between the
accused's unsupported version and that of the police officers present. In short,
the accused's inability effectively to reconstruct at trial any unfairness that occured
at the lineup may deprive him of his only opportunity meaningfully to attack the
credibility of the witness' courtroom identification." Wade, supra at 1934-1935.
Had the Michigan Court of Appeals acknowledge Wade, they would have been compelled
to be 'alert for conditions prejudicial to the suspect.' In view of a Wade hearing,
the Petitioner submits "Better a short inconvenience, than a lingering problem." New
York Cheif of Police, Changling (a movie based on a true story of the identity of
a boy, persuaded by New York politics, to be different than what it really was).

     Another problem that lingers are the incosistant facts and laws applied by
the Michigan Court of Appeals. Toward the facts, to open with, they stated "Defendant's
sole issue on appeal is that there was insufficient evidence to support his
identifiction as the person who committed the crimes." When in Fact, that was the
secondary issue, the primary issue consist of the Trial Court Errors. (M.C.of A.
Dec. pg. 1). "The defendant attacks victims identification of defendant on the grounds
that she inaccurately described defendant height," but that is not the case, the
fact is that the height of the assailant, given by the complainant, along with other
major details is different than the Petitioners. (M.C.of A. Dec. pg. 2). "The victim
was face-to-face with the perpetrator," however the Michigan Court of Appeals don't
give any acknowledgement to the fact that this same person gave a different description
from the Petitioners actual facial features, with the complainant stating "the
perpetrator looked like Lionel Richie." (M.C.of A Dec. pg. 2). "The victim had no
difficulty in identifying defendant in a photographic lineup just a year after the
assault." When the complainant said in her own words "I looked for a while," (Tr.
Trans. pg. 41), to the questions "And Officer LaRosa put these photograghs in front
of you. And you look at each of the individuals in there and you make an identification,
... How long would you say it took you to make that identification?" The
Complainant shows uncertainty stating "I obviously didn't want to pick
someone who didn't do it." (Tr. Trans. pg. 40-41). The Petitioner also

submits that the production of the circular 6 days prior to the
post-indictment pre-trial photograph lineup, where the Complainant works
showing the image of the Petitioner, is a strong factor for consideration
for which Michigan Court of Appeals never pays attention. (M.C.of A. pg.
2). "The victim also worked with a sketch artist the day after her assault
to create a composite sketch of the perpetrator. The Trial Court credited
the sketch as having a striking resemblance repugnant theory of the trial
seeing that there is other evidence, that was already presented, given by
the Complainant and Eyewitness, along with Defense Attorney's own opinion,
that refutes any similarity of the sketch to the Petitioner. (M.C.of A.
pg. 2). Not forgetting the assailant is taller than the Complainant while
the Petitioner is shorter than the Complainant. Amongst all other things,
they state "It is apparent that Kelly only saw the perpetrator for a short
time, but she had an opportunity to observe the perpetrator and was
reasonably accurate in what she was able to describe, that she was able
to identify defendant based on his ears. Though not detailed in her
description of the defendant." (M.C.of A. pg. 2-3). Sickening and repugnant,
where is the justice in saying that the identification of anyone can be
reasonably based on someone's ears? Unless there was some distinctive
relevant factor, for which doesn't apply, that would justify ear
identification, for which we also must note the long and wavy hair of the
assailant making it hard to make such an identification, and yet and
"unfortunately for Mr. Rucker, this contradictory and uneven testimony by
Ms. Kelly is the evidence upon which the trial court based the verdict that
Mr. Rucker was the perpetrator of the crimes suffered by Ms. Remias." (Def.
App. Br. pg. 14). The U.S. Supreme Court noted in Holmes v. South Carolina
126 S.Ct. 1727, "the State Supreme Court applied the rule that 'where there
is strong evidence of a defendant's guilt, especially where there is strong
forensic evidence, the proffered evidence about a third parties guilt' may
(perhaps must) be excluded. 361 S.C., at 342. Under this rule the Trial

Judge does not focus on the probative value or the potential adverse effects
of admitting the defense evidence of third-party guilt.... The rule...
appears to be based on the following logic: Where (1) it is clear that only
one person was involved in the commission of a particular crime and (2)
there is strong evidence that the defendant was the perpetrator, it follows
that evidence of third party guilt must be weak. But this logic depends
on an accurate evaluation of the prosecution's proof, and the true strength
of the prosecution's proof cannot be assessed without considering challenges
to the reliability of the prosecution's evidence.... By evaluating the
strength of only one party's evidence, no logical conclusion can be reached
regarding the strength of contrary evidence offered by the other side to
rebut or cast doubt.... It follows that the rule... violates a criminal
defendant's right to have 'a meaningful opportunity to present a complete
defense.' Crane v. Kentucky 106 S.Ct. 2142." Id at 1734-1735. Holmes
therefore held "exclusion of defense evidence of third-party guilt denied
defendant of fair trial."Id at 1727. The Prosecution's evidence was tenuous
at best in which, along with forensic evidence, brought forth the factor
of third-party guilt stronger than the Internally and Prior Inconsistent,
Negative and False Testimonies of the Complainant and Eyewitness. Toward
such evidence, there was no reasonableness in regards to the facts by the
Michigan Court of Appeals. In regards to case law, the Michigan Court of
Appeals stated "there is no requirement that a victim's testimony be
corroborated in a criminal sexual conduct prosecution. People v. Drohan
264 Mich. App. 77, 89." (M.C.of A. pg.2). Although, "the Trial Judge was
aware that the factual issue was identification. However, the Trial Judge
finding of proof beyond a reasonable doubt based upon the eyewitness
identification testimony of Ms. Kelly constituted an abuse of discretion."
(Def. App. Br. pg. 13). A witness's credibility could very well be a factor
of central importance to the jury , indeed every bit as important as the

- 27 -

factual elements of the crime itself. See <u>U.S.</u> v. <u>Wallach</u> 935 F2d 445, 458
However, the Michigan Court of Appeals noted "'The credibility of
identification testimony is a question for the trier of fact.' <u>People</u> v.
<u>Davis</u> 241 Mich. App. 697, 700." (M.C.of A. Dec. pg. 2). The question was
therefore whether the Trier of Fact, in a bench trial committed clear error,
and not whether or not the eyewitness testimony corroborated the
complainants. "An appellate court **will** set aside the findings of fact of
a Trial Court sitting without jury when such findings are clearly erroneous.
Ramsey, supra. Therefore, the Michigan Court of Appeals must include
eyewitness testimony factoring that "the evidence in a non-jury case is
subject to a more rigorous review than that in a jury case since a jury
is more likely to be right than the Judge alone." Ramsey, supra. Factoring
also that the Trier of Fact based her verdict on the eyewitness testimony
of identification.

The Michigan Court of Appeals acknowledge only 4 of the 8 factors
originally set forth in Kachar by Biggers through Davis supra, 702-703,
however, 2 that apply to this case were left out. (1) Prior relationship
with or knowledge of the defendant;and (8) any idiosyncratic or special
features of defendant. The first (1) would show 2 things, that the
Complainant and the Petitioner didn't know each other so there needed to
be an eyewitness to be able to identify the truth of the matter in regards
to the Complainants identification of the Petitioner, in which the Petitione
submits was never accomplished by the Trier of Fact because the eyewitness'
identification of the Petitioner exhibited major discrepancies towards
credibility, number 2, the incorporation of the circular, 6 days prior to
the photographic lineup, indicates the Complainant knew of the defendant
before the lineup. The eighth (8) would show that the crime scene descriptio
and the sketch are both different than the Petitioners facial description,
factoring hairlines from the beard to the top of the head, nose, mouth,

bone structure, eyes, and particularly scars. Idiosyncratic and special features that were never exclaimed in the Complainants descriptions of the assailant. 2 of Kachars relevant factors that the Michigan Court of Appeals pertained this case to were obviously not analyzed by that Court. (3) length of time between the offense and the disputed identification; (4) accuracy of description compared to the defendant's actual appearance. Davis noted of People v. Kurylczyk 443 Mich. 289, that "delays as long as eighteen month after a crime do not necessarily invalidate an eyewitness identification. Id, 307-308," Davis at 783. This theory, however, is relevant time as a main cause rather than it's cumulative effect as a factor of an invalid identification for which Kachar identifies. In this case, the application of Kurylczyk applied by Davis would not apply given that, realistically speaking, eighteen months is a long time to give an identification after one viewing of an individual, along with other factors that Kachar other 7 factors identify, and so is 13.4 months.

The Michigan Court of Appeals recognized "that the Michigan Supreme Court and the United States Supreme Court have recognized problems with the trustworthiness and inherent subjective accuracy of eyewitness identifications. Wade, supra; and Anderson, supra. However, this Court has declined to read that language as a general proscription against the use of such evidence. Davis supra 705-706." (M.C.of A. Dec. pg. 2). This shows the unreasonable application of U.S. Supreme Court Precedent, blatantly besmirching any acknowledgement to the Manifest Miscarriage of Justice that exist at Trial, inhibiting their own Manifest Miscarriage of Justice. They don't take in account that "Scholarly literature attacking the trustworthiness of cross-racial identification... and... a great deal of stress at the time of the crime;... distort witness' perceptions. See Thigpe v. Cory 804 F2d 897." Stevens at 1392. In this case the victim was Caucasian the Petitioner is African-American, and though the eyewitness was also

- 29 -

African-American she gave a cross-racial description of the assailant being Arabic. "Our confidence in the outcome is very much undermined. Eyewitness identification evidence uncorroborated by a fingerprint, gun, confession, or coconspirator testimony, is a thin tread to shackle a man forty years. Moreover, it is precisely the sort of evidence that an Alibi defense refutes best." Griffin v Warden, M.D. Correctional Adjustment Center 970 F2d 1355 1359. The identifications given by the Eyewitness and Complainant, along with their improprieties and forensic evidence convey an absence of evidence towards the guilt of the Petitioner. "To uphold a conviction in the absence of any evidence as to an essential element, would be a 'Miscarriage of Justice.'" U.S. v Tapia 761 F2d 1488, 1491-1492. It is apparent that the findings of both the Trial Court and the Michigan Court of Appeals, with the Michigan Supreme Court in favor,were  not fairly supported by the record. From this we must recognize that "Public officials, whether governor or mayors or police, legislators or judges, who fail to make decisions when they are needed or who do not act to implement decisions when they are made do not fully and faithfully perform the duties of their offices." Scheuer v Rhodes 94 S.Ct. 1683, 1689. These errors, however, are not all together menial of a Trial Court or Appeal Tribunal. Exhibits A 16, B 1, 14 A 1, 14 A 1a, 14 A 2, 15 A, and 4 B, all consist of the rush to judgment, unfair Trials that are obviously prevalent and common, making a mockery of the Michigan Judicial Community. Its reputation is at stake in the formulation Justice toward the public interest.

*Jackson Citizen*
*Wed. Jan 7 2009*
*A3 Local*

**Court takes case about lawyers**

LANSING — Michigan's
Supreme Court is jumping into a
major dispute over how publicly
appointed lawyers represent
poor people accused of crimes.

The court has agreed to take an
appeal in a case that challenges
Michigan's public defender system.

Three counties — Berrien, Genesee
and Muskegon — are accused of
violating the rights of defendants
through an underfunded system
that encourages plea bargains, not
a vigorous defense against crimes.

The lawsuit names the state of
Michigan, not the three counties.
In June, the state Court of
Appeals said the lawsuit could go
forward.

## POLLY'S ROBBERY

# Lawyer's key on inconsistent accounts

By Steven Hepker
shepker@citpat.com — 768-4923

A key witness testified Tuesday that
he bought some clothes and a Chevro-
let Caprice with his $1,200 share from
the November 2007 robbery of the Pol-
ly's Country Market on Spring Arbor
Road.

Joshua Lay, testifying in the armed-
robbery trial for Peter and Jodi Rodri-
guez, has offered at least three varia-
tions on how the booty was divided
five ways.

Defense attorneys Susan Dehncke
and Andrew Kirkpatrick grilled Lay
on inconsistencies in his police inter-
view, preliminary hearing testimony,
pre-sentence report and his testimony
Monday.

The defense started presenting its
case Tuesday afternoon. Jodi and
Peter Rodriguez were expected to tes-
tify today.

Assistant Prosecutor Jessica Suther-

land alleges Jodi Rodriguez, who was a
Polly's employee, was the mastermind
of the robbery and that her father, Peter,
drove the getaway vehicle for Lay, An-
twon Baker and Antwone Ruff.

Dehncke and Kirkpatrick say the
three committed the crime on their
own, and blamed the Rodriguezes to
make plea deals.

Dehncke argued Tuesday that Lay
told Baker and Ruff the stolen money
— the amount of which has been in-
consistently stated — would be divided
among them and the Rodriguezes so he
could keep three shares for himself.

Lay, Baker and Ruff all pleaded guilty
to one count of armed robbery and
await sentencing.

"They said they robbed the Sum-
mit Township store before midnight
on Thanksgiving eve, all wearing gloves,
masks or bandannas and two carrying
BB guns.

Ruff said he was under the influence
of Ecstasy, and was not armed.

Lay said the plan to rob Polly's
evolved over two or three years, and
Jodi Rodriguez told him when, where
and how to strike.

Kirkpatrick said Lay's account ranged
from having no conversation to receiv-
ing two calls from Jodi Rodriguez from
the day of the robbery, or one call from her
and one call from her father.

In cross-examination by Dehncke, Lay
said he had no conversation with Peter
Rodriguez about robbing the store.

Sutherland countered Lay's shifting
accounts with a series of general ques-
tions to which Lay responded that Jodi
Rodriguez hatched the plan, and she
complained when he left some bags of
money in the store.

He said the money was still five ways
within a half-hour of going to him and the
three Rodriguezes, and that the Rodriguezes
were due to take a cut of the robbery
money the next day.

— Staff writer Danielle Quisenberry

*Grand Rapids Press*
*Tues, Dec 22, 2009*
*A 14*

*Exhibit: A3*

Friday, Dec 18, 2009 Grand Rapids Press Region A16

Exhibit:
A 16

# PHOTO OF DAY: EXONERATED AFTER 35 YEARS

GUILTY!

AP PHOTO

James Bain, 54, center, walks down the Polk County Courthouse steps Thursday with Melissa Mantle, left, and Seth Miller of the Innocence Project in Bartow, Fla. Bain was released Thursday after 35 years in prison for a 1974 rape conviction when new DNA evidence exonerated him. He made his first cell-phone call — to his mom — and looks forward to a meal of fried turkey and Dr Pepper. He wants to go back to school.

## Detroit police lab cases face review after errors

**DETROIT — Authorities will review more than five years of files to search for cases where gun evidence may have been misjudged by the Detroit police lab, a prosecutor said Friday.**

Wayne County Prosecutor Kym Worthy announced details of the review, more than two months after the Detroit lab was shut down because of errors and incompetence.

In some cases, Michigan State Police will conduct new tests on evidence. The period is 2003 through much of September 2008.

"I want people to continue to have confidence in the Wayne County Prosecutor's Office and the criminal justice system," Worthy said.

The work, expected to take at least three years, would be paid by the city. Worthy has estimated the cost at more than $2 million. The teams will include prosecutors, defense lawyers and possibly former judges.

Saturday, Dec. 13, 2008
Lansing State Journal
Local & State B1

Lansing State Journal

# LOCAL&STATE   B

**EDITOR: AL WILSON | METRO@LSJ.COM | 377-1154 | WWW.LSJ.COM ★**

THURSDAY
DECEMBER 18, 2008

# 2 dropped from McCollum suit

## Detectives were among a dozen sued by wrongfully convicted man

KEVIN GRASHA
kgrasha@lsj.com

Two key people named in a lawsuit filed by Claude McCollum, the Lansing man who was wrongfully convicted of murder, are no longer being sued, court documents show.

Michigan State Police Detective Sgt. James Young — whose re-analysis of a surveillance video ultimately led to McCollum's exon-

eration — and retired Lansing police Detective Bruce Lankheet had been among a dozen people and entities named in the civil suit, which was filed earlier this year.

An order dismissing Young and Lankheet from the case was signed Dec. 11 in U.S. District Court in Grand Rapids by Judge Gordon Quist.

The lawsuit, filed in January, contends authorities violated McCollum's civil rights. The

31-year-old Lansing man was wrongfully convicted in the 2005 murder of Carolyn Kronenberg, a Lansing Community College professor. That conviction was thrown out last year, and McCollum was freed from prison.

Young's former attorney, Larry Schneider, commended McCollum's attorneys for agreeing to the dismissal.

"If it were not for Jim Young, Claude McCollum would still be in prison today," Schneider said, adding: "From my perspective,



McCollum

he's a hero."

Lankheet's attorney did not return calls seeking comment. Lankheet conducted the interrogation of McCollum, during which McCollum made statements authorities saw as a confession.

Hugh Clarke Jr., one of the attorneys representing McCollum, said numerous counts still are pending against other defendants, including former Ingham County Assistant Prosecutor Eric Matwiejczyk, who was fired earlier this year over his handling of the case, and Lansing Community College Detective Rodney Bahl, who headed the police investigation.

Several counts against Matwiej-

See McCOLLUM | Page 2B

### WHAT'S NEXT

▶ U.S. District Judge Gordon Quist is expected to make further rulings regarding Claude McCollum's lawsuit in the next few weeks.

zyk and Ingham County Prosecutor Stuart Dunnings III were dismissed in the Dec. 11 order.

Clarke said he expects Quist to make further rulings in the next few weeks, including about whether Dunnings can be held liable for failing to properly train and supervise Matwiejczyk.

## McCollum: More rulings expected

CONTINUED FROM 1B

18
7.9.75

Case 2:10-cv-10978-PJD-MJH  Document 1-2  Filed 03/22/10  Page 37 of 50

# Inmate serving life asks Granholm for freedom

## Man maintains innocence for almost 2 decades

*"I will not take responsibility for a crime I did not commit."*

**Efren Paredes Jr.**
35-year-old inmate, convicted at 16

**CLEMENCY REQUEST HEARING DRAWS 140**



**Accused at age 15:** Hans Koppenhoefer stands earlier this month by a photo of his son, Efren Paredes Jr., who was sentenced to life in prison without parole for murdering his boss at age 15. Now 35, he has an outside statute at freedom after almost two decades.
*Associated Press file photo*

4B • Thursday, December 18, 2008 • Lansing State Journal

## LOCAL

BLACKMAN TWP. —

DAVID EGGERT
Associated Press

Honor student Efren Paredes Jr. wasn't old enough to drive when sentenced to life in prison without parole for murdering his boss at age 15.

Now 35, he has an outside chance at freedom after proclaiming his innocence for almost two decades.

The possibility is a nightmare for the victim's family, who thought his killer would die behind bars. But it also means hope for Paredes and supporters who say he was wrongfully convicted because of a rush to judgment, unfair trial and slanted media coverage.

### Claiming innocence

Grocery store manager Rick Tetzlaff, 28, was shot to death March 8, 1989, during a robbery at Roger's Foodland in St. Joseph. Paredes was a part-time bagger at the store who had no criminal record before his arrest and jury conviction.

The decision rests with Gov. Jennifer Granholm, who can commute, or reduce, criminal sentences. She likely will give weight to whatever recommendation comes from the Michigan Parole Board, which this month held an emotional, nine-hour public hearing on Paredes' clemency request.

"I will not take responsibility for a crime I did not commit," a handcuffed Paredes told parole board members.

The record-long hearing

inside a Jackson-area prison training facility drew more than 140 people.

While commutation proceedings have become more common in the governor's second and final term, few — if any — have gained as much attention or inflamed so many passions.

### Mixed thoughts

The case isn't just about guilt or innocence but also is a referendum of sorts on whether prisoners should get mandatory life sentenc-

• The injustice
Must End:
http://www.
4efren.com

es — without parole for crimes committed before age 18.

Paredes is among more than 300 juvenile lifers in Michigan's 49,000-inmate system.

Somber police and prosecutors who worked the case, along with tearful family and friends, traveled hours to testify against his release.

A large group of supporters came out for Paredes, including family, a Lansing radio host, Michigan State University Latino students, peace activists and a private investigator who has helped free innocent people from prison.

To advocates, Paredes is the "Efren" — an inspirational figure who went to prison a boy and made the best of it by earning a GED, becoming a teacher's aide, writing poetry, maintaining a good prison record and transcribing textbooks into Braille.

"Please don't sacrifice this

man's future to cover up the mistakes of the justice system," said Joyce Gouwens, who has served on a Berrien County juvenile justice task force.

To opponents, Paredes was "inmate 203116" — a cold-blooded monster with a comfortable upbringing who would be a threat to society if freed.

### Second chance?

"I'm angry I have to be here," said Tina Tetzlaff, Rick's wife, who was pregnant with their second child when her husband was killed.

She acknowledged Paredes is making strides in prison but asked the parole board to remember her two sons who grew up without their dad.

Prosecutors said mandatory life with no parole for first-degree murder is Michigan's promise to victims' families, a trade-off for not having the death penalty.

The parole board will take longer than normal to give Granholm a recommendation because of the volume of materials to review.

Paredes' backers said age should be a factor but in the other direction. He was 15 when the crime was committed and 16 when convicted.

Supporters said even if Paredes did murder Tetzlaff, juveniles shouldn't be treated the same as adults when they're deemed too young to vote.

"I could have turned out to be the person others have tried to make me out to be," Paredes said, in asking for a second chance to reclaim my life."

Exhibit: 4B

Exhibit: 15 A

DETROIT FREE PRESS WWW.FREEP.COM Thur, Dec 11 2009 EDITO

# JEFFREY WARREN JOHNSON: 30 YEARS IN PRISON

# Destroyed evidence tainted 2nd trial

By JEFF GERRITT



Jeffrey Warren Johnson
Michigan Department of Corrections

Jeffrey Warren Johnson wants only to live free and in peace and support himself.

Jeffrey Warren Johnson knows he did the right thing by maintaining his innocence. But after 30 years in prison, he doesn't know if he did the smart thing.

The Detroit native, now 52, could have pleaded guilty and gone home 15 years ago. Before Johnson's second trial in 1991, Assistant Wayne County Prosecutor William Morris offered Johnson a manslaughter charge and 15 years max, if he copped a plea. But Johnson refused to admit to something he didn't do.

After Johnson's first trial resulted in a hung jury, his young court-appointed attorney, Ralph Shirin, recommended that Johnson take the deal, even though Shirin was convinced he was innocent. Shirin knew a second trial would be tougher for the defense.

And it was. Police destroyed fingerprint evidence and damaging testimony from witnesses.

There was no murder weapon, and police claimed they could have been on the murder weapon, Johnson was convicted of first-degree murder.

Now serving a mandatory life sentence at Lakeland Correctional Facility in Coldwater, he seeks a commutation. Gov. Jennifer Granholm should grant him one, based on time served, his record before and after the crime, and probable innocence.

On July 18, 1978, Johnson, then 22, was convicted of the slaying of 18-year-old Kevin May while May walked down an alley. Johnson had called 911 after hearing shots while shoveling snow near his garage in northeast Detroit. The shotgun used in the Detroit murder was legally registered to Johnson.

Johnson graduated from Pershing High School in 1974 and then attended Denver Automotive and Diesel College.

Johnson lived in Detroit, from 1991-97. I tried but failed to contact him. Records show this Darryl Asbell would be the right age. Records search, I located a Darryl Asbell in Newnan, Ga., a city of 27,000, 93 miles south of Atlanta. At 55, he would be the right age. Re-cords search, I located a Darryl Asbell in Newnan, Ga., through an online public record. But just last week, I pursued Asbell beyond Detroit.

Police apparently never suggested that Johnson was making up Darryl Asbell.

But the conviction had other cracks. During the second trial, the prosecutor suggested that Johnson was making it up that police intentionally suppressed evidence.

On or show that police in a reversal of convic-tion, without a defense attorney requesting it, did not mandate a reversal of convic-tion, or show that police in a positive matchup, Johnson challenged the action on appeal. In 1982, the state appeals court ruled that the evidence loss, without a defense at-

That summer, before Judge George Crockett III, police said the fingerprints on the murder weapon were not Johnson's. He was released on $15,000 bail. In April, Judge George Crockett Jr. declared a mistrial after the jury failed to reach a verdict.

During the second trial that summer, before Judge George Crockett III, police said the fingerprints on the gun were unidentifiable smudges. Unfortunately for Johnson, police destroyed the fingerprint evidence after 30 days, as the department usually did when it couldn't make a positive matchup. Johnson challenged the action on appeal.

His trial attorney remembers Johnson as polite and pleasant. "The juries I talked to after the first trial couldn't figure out why this kid was here," Shirin told me last week.

In prison, Johnson, ticket-free since 1992, has maintained a good conduct record. He almost completed a four-year degree in criminal law, with a 3.2 grade-point average, before college programs ended in the early 1990s.

Odis Buffington, 67, a Detroit real estate investor and Johnson's uncle, said the family fully supports his nephew, who would be no threat to anyone if he got out of prison. "I'd stake my life on it," Buffington told me. "He would be a productive citizen. I'm not saying that because he's my nephew, because, believe me, I have nephews I wouldn't say that about."

Johnson tries to do his time easy. He works at an institutional job and takes long walks in the yard, listening to opera — much to the amusement of other inmates. It's too late, he said, to start a family or career. He wants only to live free and in peace and support himself.

"You know that Dirty Jobs show on the Discovery Channel?" he asked me during a prison interview. "Well, no job is too dirty for me."

CONTACT JEFF GERRITT...

At a packed, nine-hour public hearing for Efrén Paredes Jr., conducted by the Michigan Parole Board and attended by nearly 140 people, Paredes' trial and conviction were debated for several hours. If wrongful conviction was irrelevant, why spend that much time rehashing the trial?

Assistant Attorney General Charles Scheffer grimaced and grilled Paredes and, as usual, created undue tension by his abrasive and demeaning tone and demeanor. But Sheffer] was right in recognizing the importance of determining — while even suggesting that questions about Paredes' guilt from his many supporters were largely responsible for and hearing

In 1989, police arrested Paredes for the shooting death of his boss, grocery store manager Rick Tetzlaff, during a robbery in St. Joseph. His mother said Paredes, then a 15-year-old honor student with no criminal record, was home with his parents. Two other juveniles, who pleaded guilty to the crime, have since been released for fingering Paredes, who maintained his innocence, they made a slew of contradictory statements and have since said they were coerced by police.

At an age when Paredes was too young to vote, he was convicted by a Berrien County jury and sentenced to life in prison without possibility of parole — the maximum adult sentence. Illinois investigator Paul Ciolino, who has worked on dozens of wrongful conviction cases, told the [I,] Parole

Paredes was a case.

I just don't know, even after listening to hours of testimony. With Paredes, however, the Parole Board and governor don't need clear evidence of a wrongful conviction to commute. Now 35, Paredes has served nearly 20 years for a crime he was convicted of as a juvenile. Michigan, to its international shame, is one of the

few places in the world where a juvenile can get mandatory life.

In prison, Paredes writes essays and poetry, translates braille and maintains a good institutional record. If released, he wants to continue working with the visually impaired. Despite incarceration, he has become an emotionally and spiritually mature adult. Nothing in this man, either before the crime or since, suggests he would do anything but contribute to society.

But other cases contain overwhelming evidence of wrongful convictions that the governor and Parole Board need to consider. I've written about some of these inmates, including Darrell A. Siggers, 44, and Darryl Jamaal Woods, 36. Both men, I believe, were wrongly convicted of murder one. I've profiled two other cases today. In one, a former Michigan Supreme Court justice told me there wasn't enough evidence to take the case to trial.

Granholm has approved 61 commutations — 43 this year — mostly for sick and dying inmates. Using her commutation power recklessly would be an injustice to crime victims and the community. But not using it in even one case where it is warranted also creates a grave injustice.

*JEFF GERRITT is a Free Press editorial writer. Contact him at gerritt@freepress.com or 313-222-6585.*

was wrongful — and that's encouraging —



Michigan Department of Corrections

Efrén Paredes Jr. was sentenced to life in prison for a crime committed when he was 15 years old. An investigator told the Parole Board that Paredes was a classic wrongful conviction case.

Exhibit: 19 A 2 a

# Justice makes case for commutations

Thursday, Dec. 11, 2008   Editorial dept: 313-222-6583, letters@freepress.com

Detroit Free Press   www.freep.com



TIM BRINTON/Special to the Free Press

## JEFF GERRITT



...ith nearly 50,000 in-mates and one of the ...on's highest incarceration ...s, Michigan's 41 prisons ...d hundreds of people who ...d be safely released. Jus-ture Gov. Jennifer Gran-holm to commute the sentenc-...of every inmate worthy of ...urning to society. Commu-...tions are the last hope for ...st inmates serving manda-...y life sentences, many of ...m have already done 30 ...rs or more behind bars.

To do row, Granholm has ...n reluctant to use her com-...ation power — or to con-...r probable innocence in ...ding whether to grant one.

...und other things, Granholm ...siders risk to the public, the ...te's age, time served, ...tutional record, the nature ...e crime — and whether ...mate has accepted re-...ility for it. That makes ...derations of innocence ...ant because the Parole ...d and governor typically ...re an inmate to show ...rse before release. But it's ...r for an inmate to show ...rse for a crime he or she ...not commit.

William Milliken, Michi-...'s governor from 1969-82, ...muted 95 sentences, all for ...-degree murder.

...granted a lot of commuta-...," he told me ...week. "The one regret I ...s that I didn't grant ...

...en avoided criticizing ...ays the gentleman, ...

...is that I didn't grant ...'s age, time served, ...

— and on corrections issues in general — is not only a lack of political courage but also an unbridled faith in the criminal justice system. She has told me more than once that she won't second-guess a jury. But DNA technology, here and around the country, has shown, abso-lutely and repeatedly, that people are wrongfully convict-ed.

"When an injustice occurs," he told me, "a wrong needs to be corrected, and a governor is the one person who can do it," Gov. Granholm, a former prosecutor, is a very decent and capable person whom I like and admire. But her prob-

...rors don't understand what, legally speaking, "reasonable doubt" means.

Making matters worse, scandalously low pay for court-appointed attorneys and a lack of state standards and over-sight have made Michigan's public defense system one of the nation's worst.

Nor do the state appeals courts and Michigan Supreme

Unfortunately, such evi-dence is available in only a fraction of cases. In others, incompetent defense attor-neys, jury bias or a prosecutor withholding evidence can lead to a wrongful conviction. As someone who has served on two juries, I also know that

Court, which practically rub-ber-stamp criminal convic-tions, provide much relief. Barb Tieber, one of the nation's leading appellate lawyers, said Lansing Attorney F. Martin that Michigan's appellate courts are unreasonable in ruling on constitutional is-sues.

A commutation hearing in Jackson last week suggested that Michigan's appellate courts have concluded, increasingly, have concluded that "Even the federal courts," he told me. "I've had great cases that I have won in the '70s and '80s that don't win now," appellate review in Michigan has become abysmal.

...governor should consid- ...ed.

...e sentences when ...s Milliken said, has the ...e on crime. But a gover-...doesn't want to be tagged ...tions, probably because ...current governor has ...very timid about com-...ant moral obligation to ...In rare cases, he ...

...degree murder.

Case 2:10-cv-11132-NGE-VMM   Document 1-2   Filed 03/22/10   Page 41 of 50

Thur, Dec 11 2008
Detroit Free Press

14 R

Exhibit: 14R2

## FREDERICK FREEMAN: 20 YEARS IN PRISON

# Shaky evidence still led to murder conviction

BY JEFF GERRITT

Frederick Freeman was found guilty of gunning down 20-year-old Scott Macklem in a parking lot at St. Clair County Community College in 1986. But the case was so weak it should never have gone to trial, with eyewitnesses testifying that Freeman was more than 400 miles away. Former Michigan Supreme Court Justice Thomas Brennan, after reading the court transcripts, said he would have probably dismissed the case due to insufficient evidence.

"A lot of things about this case really had a bad smell," Brennan told me last week.

Serving a life sentence for first-degree murder, Freeman, 45, has already spent more than 20 years in prison. Gov. Jennifer Granholm is his best hope for release. His many supporters include WXYZ-TV

reporter Bill Proctor, state Sen. Hansen Clarke, D-Detroit, and Herb Welser, a retired Port Huron police detective/lieutenant.

Macklem, a college student and the son of Croswell Mayor Gary Macklem, was killed by a shotgun blast on Nov. 5, 1986. At first, Freeman was a legitimate suspect. But Port Huron police locked in on Freeman long after evidence pointed the other way, said Welser, who was on the force at the time but not involved in the investigation.

"The son of the mayor of Croswell was murdered in a college parking lot," said Welser, now a private investigator working for Freeman without pay. "You can imagine the pressure to solve this case. I'm absolutely convinced he's innocent."

Freeman's connection to the murder was a former girl-

friend, Crystal Merrill, who was engaged to Macklem when he was gunned down. Freeman and Merrill dated briefly the previous spring but hadn't spoken to each other for nearly six months, Merrill testified. But she said Freeman had a cache of ninja weaponry and was dangerous.

A single eyewitness picked Freeman out of a photo lineup as the man he saw, through the windshield, driving a car near the crime scene. No physical evidence linked Freeman to the crime, and prints on a shotgun shell box near the scene didn't match his. At the trial, six eyewitnesses testified Freeman was 450 miles away, in the Escanaba area, on the day Macklem was shot. Three placed him there within three hours of the shooting. Freeman was renting a house in Rock, about 20 miles north of Escanaba, living with a girlfriend,

singing sporadically in a band and working part-time, selling vitamins.

"None of the witnesses were friends or relatives — I'm not even sure they liked him," said Proctor, who has spent hundreds of hours on the case. "They had no reason but the truth to make the trip from Escanaba."

Proctor, a former federal police officer in Washington, D.C., spent two years investigating before he was convinced Freeman, who passed a polygraph test, was innocent.

St. Clair County Prosecutor Robert Cleland, now a federal judge, argued that Freeman could have chartered a plane to commit the crime, but gave no evidence that Freeman did.

"For the prosecution to suggest this ... was just bizarre," Brennan said.

Freeman's court-appointed attorney, David Dean, was later

suspended from practicing law in Michigan for illegal drug use. A jailhouse snitch, Philip Joplin, testified that Freeman had confessed to the killing but later said he lied to get a better deal from prosecutors.

In 2007, the governor's new Executive Clemency Advisory Council voted unanimously that Freeman's case had merit, records show. On Feb. 15 of this year, the Parole Board voted 6-3 to take "preliminary interest" in the case, said MDOC spokesman Russ Marlan. But after getting a psychological report, the board voted 9-0 on April 25 to oppose the commutation.

Captain Jim Jones of the Port Huron Police Department told me police consider the case closed and would reopen it only if the prosecutor's office requested it because of new evidence. No officer who investigated Freeman's case is



Michigan Department of Corre...

Frederick Freeman: "I want to l
vindicated."

with the department today.

In prison, Freeman, Inma No. 189355, legally changed named to Temujin Kenso to reflect his Buddhist faith. In 2001, he married Denise Dennger, now A'miko Kensu. S lives in Swartz Creek, work a Meijer store and presides f her husband's freedom.

Freeman wants more the commutation — he wants hi record wiped clean.

"I don't want to just go home," he told me last mont Saginaw Correctional Facili "I want to be vindicated."

MICHIGAN DEPARTMENT OF CORRECTIONS
# PRESENTENCE INVESTIGATION REPORT

I-145
ev. 2/06

Honorable: Vera Massey Jones

County: Wayne County

Sentence Date:

MDOC Nbr.: 657235

Attorney: Winters, William

Appointed/Retained: Appointed

Defendant: Rucker, Jeremy

Age: 33

D.O.B.: 02/21/1974

## CURRENT CONVICTION(S)

| Final Charge(s) | | | Max Yrs | Mo. | Days | Jail Credit Days | Bond | Convicted By | Conviction Date |
|---|---|---|---|---|---|---|---|---|---|
| Charge(1): 07006144-01 | 750.520C1E | Criminal Sexual Conduct, 2nd Deg (Weapon Used) (Hab Crim 2nd Off.) | 22 | 6 | | 167 | Not Posted | Bench | 07/26/2007 |
| Charge(2): 07006144-01 | 750.520G1 | CSC - Assault With Intent to Commit Sexual Penetration (Hab Crim 2nd Off.) | 15 | | | 167 | Not Posted | Bench | 07/26/2007 |

Plea Agreement: None Noted

Pending Charges: N Ops
N Ops

HYTA: No

Where: 19th District Court
36th District Court

Status at Time of Offense: None

## PRIOR RECORD

Conviction: Felonies: 1

Misdemeanors: 1

Juvenile Record: No

Probation: Active: No

Former: Yes

Pending Violation: No

Parole: Active: No

Former: No

Pending Violation: No

Current Michigan Prisoner: No

Currently Under Sentence: No

| Sentence Date | Offense | County/State | Sentence | Min. | Max. |
|---|---|---|---|---|---|
| N/A | | | | | |

## PERSONAL HISTORY

Where Employed: Minute Man

Education: High School Diploma

Psychiatric History: No

Physical Handicaps: No

Marital Status: Separated

Substance Abuse History: No

| What | How Long |
|---|---|
| N/A | N/A |

PA511 Eligible: No

Investigating Agent: Nancy Berg
Worksite: Wayne/Detroit Court Serv./Probation

Caseload No.:
Phone No.: ( 313 )224-7935

Date: 08/07/2007

Rucker, Jeremy

CFJ-145   Page:1

MICHIGAN DEPARTMENT OF CORRECTIONS
## PRESENTENCE INVESTIGATION REPORT

CFJ-145

Rev. 2/06

# DEPARTMENT OF CORRECTIONS RECOMMENDATION

**Jail Credit:**

DOCKET NO.  **07-6144-01**

| Date(s) | Action | Sentence Details | Days |
|---|---|---|---|
| 02-25-07 to 08-09-07 | Arrest | | 167 |
| | | **Total Days Jail Credit** | **167** |

It is respectfully recommended the defendant be sentenced to the Michigan Department of Corrections for a period of incarceration with credit for 167 days served.

Supervisor: Michelle S. Anderson

Date:  08/07/2007

cker, Jeremy

**MICHIGAN DEPARTMENT OF CORRECTIONS**
**BASIC INFORMATION REPORT**

4836-6101
12/06 CFJ-101

| Court Name (Last, First, Middle) | | MDOC Nbr. | Given Name (Last, First, Middle) |
|---|---|---|---|
| Rucker, Jeremy | | 657235 | Same |

| Name Type | Other Names (Last, First, Middle) |
|---|---|
| N/A | None |

| Place of Birth | | | Last Known Address & Telephone No. |
|---|---|---|---|
| Michigan | Citizenship USA | | |

| State & DLN   None | | DOB   02/21/1974 | 16846 Dolphin |
|---|---|---|---|
| SID No.   1741007P | | FBI No. 948402VA2 | Detroit Michigan |
| Race Black or African American | Sex Male | Hair Black | Eyes Brown | ()- |

| Height 5'7" | Weight 165 | Highest Grade Completed 12th Grade | Occupation Laborer | Health Ins. No | Assets-$1,500 & Up No | Monthly Income of $75 & Up No |
|---|---|---|---|---|---|---|

| Marital Status Separated | Dependents 2 | Religion No Preference | Military Branch None | Military Dates None | Discharge Type None |
|---|---|---|---|---|---|

| Marks, Scars, Amputations, Tattoos | Drug Abuse | Alcohol Abuse | Mental Health Treatment |
|---|---|---|---|
| Scar  Chin | No | No | No |

## CRIMINAL HISTORY

| | Juvenile | | | Adult | | | Status at Time of Offense | | |
|---|---|---|---|---|---|---|---|---|---|
| Comm. 0 | Prob. 0 | Esc. 0 | Jail 0 | Pris. 0 | Prob. 2 | Esc. 0 | X | None | Delayed Sentence |
| | | | | | | | | HYTA | Parole |
| Age of First Arrest 20 | | Sex Offense Convictions 1 | | SAI Eligible No | | | | Probation | Jail |
| | | | | | | | | District Probation | State Prison |
| Pending Charges in Court No | | No. of Prior Felony Convictions 1 | | | | | | Federal Probation | On Bond |
| | | | | | | | | Federal Parole | Juvenile Court Supervision |

| Type of Report Presentence | County   Wayne County | | Agent & Caseload No. | |
|---|---|---|---|---|
| | DOC Recommended Disposition   4 | Probation Violation New Sentence   No | Probation Violation Technical   No | |

## CURRENT OFFENSE

| NO.   1   OF   2 | Docket No.: Charge (1): 07006144-01 | |
|---|---|---|

| PACC Code 750.520C1E | Offense Criminal Sexual Conduct, 2nd Deg (Weapon Used) (Hab Crim 2nd Off.) | Last Name: Rucker | |
|---|---|---|---|
| Victim / Relationship Remias, Jennifer - No Relationship | | Max 22 yrs.6 mos. | Consecutive Sentence No |
| | Codefendant(s) None | | |

| Circuit 03rd Circuit Court - Wayne County | | | |
|---|---|---|---|
| | Judge Vera Massey Jones | Attorney Winters, William | Retained / Appointed Appointed |
| Method of Conviction Bench | Date of Offense 10/03/2005 | Date of Arrest 02/25/2007 | Date of Bond N/A | Date of Conviction 07/26/2007 | Jail Credit 167 | Guilty But Mentally Ill No |

## DISPOSITION

| Sentence Type | | Sentence Date 08-09-2007 | CTN 820662977801 | Fine | Cost | Restitution |
|---|---|---|---|---|---|---|

| MINIMUM | | | MAXIMUM | | | LIFE | JAIL | | Supervision Fees | Crime Victims Assessment |
|---|---|---|---|---|---|---|---|---|---|---|
| Years | Months | Days | Years | Months | Days | | Months | Days | | |

| Attorney Fees | | Forensic Fees | | Restitution Fund Fees | | Other Fees |
|---|---|---|---|---|---|---|

| Sentencing Guidelines | | | | | |
|---|---|---|---|---|---|
| RANGE | | | LIFE | NA | Prior Record Total 5 | Offense Variable Total 45 |
| Low:   19 | High:   47 | | | | |

Comments:

Jeremy - 657235
07  11:00:10

MICHIGAN DEPARTMENT OF CORRECTIONS
BASIC INFORMATION REPORT

4836-6101
12/06  CFJ-101

# CURRENT OFFENSE

| NO. 2 OF 2 | Docket No.: Charge (2): 07006144-01 | | Last Name: Rucker | |
|---|---|---|---|---|
| PACC Code 750.520G1 | Offense CSC - Assault With Intent to Commit Sexual Penetration (Hab Crim 2nd Off.) | | Max 15 yrs. | Consecutive Sentence No |
| Victim / Relationship Remias, Jennifer - No Relationship | | Codefendant(s) None | | |
| Circuit 03rd Circuit Court - Wayne County | Judge Vera Massey Jones | | Attorney Winters, William | Retained / Appointed Appointed |
| Method of Conviction Bench | Date of Offense 10/03/2005 | Date of Arrest 02/25/2007 | Date of Bond N/A | Date of Conviction 07/26/2007 | Jail Credit 167 | Guilty But Mentally Ill No |

# DISPOSITION

| Sentence Type | | | Sentence Date 08-09-2007 | CTN 820662977801 | | Fine | | Cost | | Restitution | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| MINIMUM | | | MAXIMUM | | | LIFE | JAIL | | Supervision Fees | | Crime Victims Assessment |
| Years | Months | Days | Years | Months | Days | | Months | Days | | | |
| Attorney Fees | | | Forensic Fees | | | Restitution Fund Fees | | | Other Fees | | |

Sentencing Guidelines

| RANGE | | | LIFE | NA | Prior Record Total 0 | | Offense Variable Total 0 | |
|---|---|---|---|---|---|---|---|---|
| Low: 0 | High: 7 | | | | | | | |

Comments:

---

er, Jeremy - 657235
2007  11:00:10

## Michigan Department of Corrections
## Presentence Investigation

**CFJ-284**

**Rev. 10/03**

## Evaluation and Plan

The defendant, Jeremy Rucker, is a 34 year old separated father of two children. The defendant is before the Court for his second conviction for the charge of Criminal Sexual Conduct. The defendant was convicted in the 16th Circuit Court in Macomb County on the charge of Criminal Sexual Conduct 4th Degree on 06/17/94 and was sentenced to a two year term of probation and six months on Electronic Monitoring. He was successfully terminated from probation on 7/30/96. The defendant is now before the Court as he was found guilty at a waiver trial of the charges of Criminal Sexual Conduct 2nd Degree and Assault With Intent To Commit Criminal Sexual Conduct Second Offense.

The defendant reports that he is the product of the marriage of Arnell and James Rucker. The defendant's parents separated when he was 6 and he states that he lived between the two households. He denies being subjected to any physical, emotional or sexual abuse. The defendant reports his father was employed as a computer technician and is currently residing in Arizona in a Veteran's Hospital. The defendant reported his mother, Arnell Rucker, resides on Pickford in the City of Detroit, however, he could not or would not provide an address or phone number for his mother. His mother could not be located through Bressler's Directory or Directory Assistance. The defendant appears to have no stable place of residency as he reports that his mother had moved from 6764 Garland in Dearborn Heights, MI. The only phone number the defendant could provide was for that of his friend, Laurie Anderson. The defendant provided an inaccurate address for Ms. Anderson. She was contacted by phone and confirmed that the defendant did not have a stable place to reside. Ms. Anderson further stated, to the best of her knowledge, that the defendant's mother last lived on Warren Avenue in Dearborn, Michigan.

The defendant states that his brother, James Rucker, is currently incarcerated at the Coldwater Correctional Facility also for the charge of Criminal Sexual Conduct, however, his brother could not be located in the OMNI system.

Positively, the defendant has maintained employment through the Minuteman Temporary Service, located on West Vernor. This was verified by employment specialist, Bruce. Bruce stated that the defendant is a good worker and reported regularly. Also, the defendant received a high school diploma at Murray Wright High School in 1992.

The defendant was registered as a Sex Offender on 01/18/96 for the period of 25 years. He was re-registered as part of this investigation as the new offense requires a lifetime registry.

The defendant's sentencing guidelines are 19 to 47 months. A term of incarceration within the guideline range is respectfully recommended.

## Agent's Description of the Offense

## Michigan Department of Corrections
## Presentence Investigation

CFJ-284

Rev. 10/03

The following information was garnered from the Detroit Police Department's Investigator's Report of 10/03/05:

On October 3, 2005, the complainant was walking to her car in the parking lot of Captain's Restaurant in the area of Schweitzer and Woodbridge in the City of Detroit, County of Wayne. The complainant arrived at her vehicle and opened the car door. She sat down in her vehicle and put the keys in the ignition and looked down to plug in her cell phone into the charger. The complainant started the car and shut the car door and the defendant pulled the car door open. The complainant saw a gun. The defendant said, "be quiet, or I'll shoot". The defendant entered the car and put the gun to the back of the complainant's head. The defendant attempted to kiss the complainant and put his tongue in her mouth. The defendant then laid on top of the complainant lifting her shirt up, kissing and touching her breasts. The defendant attempted to remove the complainant's pants. The complainant was screaming and the defendant stuck the gun into her side and stated "shut up or I will shoot". The complainant tried to hit the defendant with her keys. A witness observed the events taking place and heard the complainant screaming. She called the police. The defendant left the location on foot. Officers responded and a report was taken. The vehicle was conveyed to 7800 Dix to be processed by the Crime Scene Unit. Photographs were taken and fingerprints were lifted off the vehicle. The complainant went to the Graphic Arts section and provided a sketch of the defendant and a photograph was generated.

On November 8, 2006, the defendant was in the area of Woodward and Franklin. The defendant approached a female on foot and touched her buttocks and ran. The defendant was found, arrested and identified as Jeremy Rucker, Date of Birth: 02/21/1974. The defendant was released the same evening. A photo showup was conducted with the original complainant and she identified the defendant as the person who had assaulted her on October 3, 2005.

A warrant was issued for the defendant's arrest in the instant offense on 12/01/06. The defendant was arrested on the instant offense on 2/25/07. The defendant was found guilty at a waiver trial of the charges of CSC 2nd Degree and Assault with Intent To Rape, Second Offense on 7/26/07 and is scheduled to be sentenced on 8/9/07 under Docket #07-6144.

## Consecutive Sentences

No information was provided by the Wayne County Prosecutor's Office; however, in similar instances, consecutive sentencing is not applicable.

## Victim's Impact Statement

The victim's impact statement is as follows:

"I told my story in Court. This has affected my entire life very much. I pursued counseling at first but I stopped, but I know I need to go back. I can't be home alone at night. He stole my innocence. I feel because I smiled at im, he victimized me. It was disgusting. It has affected my relationship with my husband. I can't feel the same

# Michigan Department of Corrections
## Presentence Investigation

CFJ-284

Rev. 10/03

about sex.  He was slobbering all over me and grunting. He was threatening to kill me and jamming a gun in my back.  He showed no remores, no feeling for what he did to me. I'm 100% sure he is the one who did it".

The victim claims no restitution. The name is ommitted at the complainant's request.

## Defendant's Description of the Offense

The defendant declined to provide a statement regarding his involvement in the instant offense.

## Criminal Justice

**Juvenile History:**

This investigation revealed no juvenile criminal history for this offender.

NO.  1  OF  1

| Offense Date: | None |
|---|---|
| Petition Date: | |
| Petitioning Agency: | |
| Charge(s) at Petition: | |
| Court of Jurisdiction: | |
| Final Charges: | |
| Adjudication Date/Method: | |
| Sentence/Disposition: | |
| Sentence/Disposition Date: | |
| Attorney Present: | |
| Discharge Date: | |
| Notes: | |

**Adult History:**

NO.  1  OF  4

| Offense Date: | 04/18/1994 |
|---|---|
| Status at Time of Offense: | |
| Arrest Date: | 04/18/1994 |
| Arresting Agency: | Warren Police Department |
| Charge(s) at Arrest: | Criminal Sexual Conduct 4th |
| Court of Jurisdiction: | 16th Circuit Court, Dkt. 94-1093FH |
| Final Charges: | Criminal Sexual Conduct 4th |
| Conviction Date/Method: | 06/17/1994 / Nolo Contendere |
| Sentence/Disposition: | 2 years probation, 6 months tether |
| Sentence Date: | 08/01/1994 |
| Attorney Present: | Yes |
| Discharge Date: | 07/30/1996 |

# Michigan Department of Corrections
## Presentence Investigation

CFJ-284

Rev. 10/03

Notes:

**NO.  2  OF  4**

| | |
|---|---|
| Offense Date: | 02/26/1998 |
| Status at Time of Offense: | |
| Arrest Date: | 02/26/1998 |
| Arresting Agency: | Detroit Police Department |
| Charge(s) at Arrest: | Assault and Battery |
| Court of Jurisdiction: | 36th District Court, Dkt. 9857563 |
| Final Charges: | Assault and Battery |
| Conviction Date/Method: | 03/25/1998 / Plea |
| Sentence/Disposition: | 1 year probation |
| Sentence Date: | Unknown |
| Attorney Present: | |
| Discharge Date: | Unknown |
| Notes: | |

**NO.  3  OF  4**

| | |
|---|---|
| Offense Date: | 10/03/2005 |
| Status at Time of Offense: | |
| Arrest Date: | 02/25/2007 |
| Arresting Agency: | Detroit Police Department |
| Charge(s) at Arrest: | CSC 2<br>AWI Rape, FP |
| Court of Jurisdiction: | 3rd Circuit Court, Dkt. 07-6144 |
| Final Charges: | CSC 2 |
| Conviction Date/Method: | 07/26/2007 / Bench |
| Sentence/Disposition: | Pending/Instant offense |
| Sentence Date: | 08/09/2007 |
| Attorney Present: | Yes |
| Discharge Date: | Unknown |
| Notes: | |

**NO.  4  OF  4**

| | |
|---|---|
| Offense Date: | 10/03/2005 |
| Status at Time of Offense: | |
| Arrest Date: | 02/25/2007 |
| Arresting Agency: | Detroit Police Department |
| Charge(s) at Arrest: | Assault W/I Rape |
| Court of Jurisdiction: | 3rd Circuit Court, Dkt. 07-6144 |
| Final Charges: | Assault W/I to Commit CSC, CSC II |
| Conviction Date/Method: | 07/26/2007 / Bench |
| Sentence/Disposition: | Pending/Instant offense |
| Sentence Date: | 08/09/2007 |
| Attorney Present: | Yes |
| Discharge Date: | Unknown |
| Notes: | |

## Michigan Department of Corrections
## Presentence Investigation

CFJ-284

Rev. 10/03

**PROBATION ADJUSTMENT:**

The defendant was placed on probation to the 16th Circuit Court in Macomb County for the charge of Criminal Sexual Conduct 4th Degree in 1994. He was terminated successfully with no warrant and no violations on 07/30/96.

**Personal Protection Order(s):**

| Effective Date: | None |
|---|---|
| Issuing Location: | |
| Docket Number: | |
| Protected Person: | |
| Expiration Date: | |
| Notes: | |

**Gang Involvement:**

There has been no known prior gang involvement for the defendant.

| Start Date | End Date | Gang Name | Gang Location | Gang Role | Gang Rank/Status |
|---|---|---|---|---|---|
| N/A | | | | | |

**Gang Marks, Scars, & Tattoos:**
N/A

**Gang Names:**
N/A

## Family

| Name | Relationship | Age | Address | Phone | Occupation |
|---|---|---|---|---|---|
| Rucker, James | Brother | 38 | Coldwater Corr Facility Michigan | | MDOC |
| Rucker, Arnelle Veronica | Mother | 55 | Pickford Detroit, Michigan | | Retired |
| Rucker, James Edward | Father | 64 | VA Hospital Arizona | | Retired |
| West, Monica | Sister | 36 | Detroit, Michigan | | Homemaker |

**Comments:**

The defendant was one of two children born to the marriage of James Edward Rucker and Arnelle Veronica Rucker. The defendant stated that his father is currently residing in Arizona in a Veteran's Hospital and that he has not had contact with him for the last year. The defendant's mother, Arnelle Veronica Rucker's wherabouts are unknown to him. The defendant states that his parents separated when he was six years of age and he was